Filed 7/11/19; part. pub. & mod. order 6/2/19 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE , <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DOLPHUS DWAYNE PIERCE II, <br><br> Defendant and Appellant. | F074602 <br><br> (Super. Ct. No. BF141700E) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Thomas S. Clark, Judge.

W. Scott Quinlan for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Operating under their company, P&R Med-Legal Medical Corporation (P&R), Dolphus Dwayne Pierce, a chiropractor, and Tomas Ballesteros Rios, a physician, conspired with others to defraud various workers' compensation insurance carriers. P&R

contracted with physicians to perform cursory (if any) examinations of workers' compensation patients at chiropractic clinics, and then dispense prepackaged medications to these patients with little or no regard for medical need. Pierce and Rios contracted with a company to prepare and submit canned medical reports and bills to workers' compensation insurance carriers. These bills sought payment for the medications dispensed, and for services relating to the dispensing of medications—some of which were not performed, and some costlier than the services actually performed by the physician. Eventually, a search warrant was executed on businesses and homes associated with P&R. After P&R shut down, Pierce and Rios contracted with another company to rebill the insurance carriers for services initially billed by P&R, seeking to collect on existing unpaid bills for medications previously dispensed.

## STATEMENT OF THE CASE

In June 2012, Pierce and six codefendants (Rios, John Brent Arakelian, Maria Cecilia Rios Cabangangan, Charles Orlando Lewis, M.D., Cathy Aguilar Pierce, and Chi Hong Yang, M.D.) were charged by grand jury indictment, in count 1, with conspiracy to commit insurance fraud (Pen. Code,[1] §§ 182, subd. (a)(1), 550, subd. (a)(1), (2), (5), (7), (8); Ins. Code, § 1871.4, subd. (a)(2))[2]; 127 overt acts were alleged. As enhancements, it was further alleged that, in the commission of the offense, defendants damaged or destroyed property valued in excess of $65,000 (§ 12022.6, subd. (a)(1)); in excess of $200,000 (§ 12022.6, subd. (a)(2)), in excess of $1.3 million (§ 12022.6, subd. (a)(3)); in excess of $3.2 million (§ 12022.6, subd. (a)(4)); and that they committed two or more related felonies involving fraud or embezzlement (§ 186.11, subd. (a)(1)).[3] In counts 2,

---

[1]     All further statutory references are to the Penal Code unless noted otherwise.

[2]     Prior to trial, the section 550, subdivision (a)(1) and (2) allegations were struck as surplusage.

[3]     This allegation was dismissed prior to trial.

2.

4, 6, 8, 10, 12, 14, 16, 18, and 20, defendants were charged with submitting multiple bills for the same service (§ 550, subd. (a)(8)), and in counts 3, 5, 7, 9, 11, 13, 15, 17, 19, and 21, with false statements (physician reports) to obtain payments for medical services provided to workers' compensation patients (Lab. Code, § 3207; Ins. Code, § 1871.4, subd. (a)(2)).

Following several demurrers and preliminary motions, the case proceeded to trial on an amended indictment, which included the same substantive, but more specific, allegations contained in the original.

On October 22, 2015, jury trial against Pierce alone began.[4]  At the close of the prosecution's case, the trial court denied Pierce's motion for acquittal as to counts 1, 2, 4, 5, 12, 14, 18, and 21, but granted it as to all of the monetary enhancements attached to count 1, and as to substantive counts 3, 6, 7, 8, 9, 10, 11, 13, 15, 16, 17, 19, and 20.

At the conclusion of the evidence, the prosecution elected to proceed using only 13 of the 127 alleged overt acts of count 1.  The object of the conspiracy was to commit insurance fraud, and the violations of sections 550, subdivision (a)(5) (preparing a report with intent to present it in support of fraudulent claim), (7) (submitting a claim for an unused health care benefit), (8) (preparing multiple claims for the same health care benefit with the intent to defraud), and Insurance Code section 1871.4, subdivision (a)(2) (presenting knowingly false statements in support of workers compensation benefits), were the means to achieve this object and pertained only to P&R.

On January 8, 2016, the jury returned a verdict of guilty on count 1 and acquitted Pierce of the remaining counts.  On September 16, 2016, the trial court placed Pierce on probation for five years, with the condition that he serve one year in county jail and pay $770,421 in restitution.

---

[4]     On September 23, 2015, the charges against Pierce's wife, Cathy, were dismissed for insufficient evidence on motion of the People.

On appeal, Pierce raises numerous issues, contending the trial court prejudicially erred: (1) when it overruled his demurrer to count 1 of the amended indictment; (2) when it refused to strike reference to section 550, subdivision (a)(5) from the conspiracy charge as surplusage; (3) when it denied a motion to compel election of conspiracies at the close of the prosecution's case; (4) in jury instructions given and refused; (5) when it denied a motion for acquittal; (6) when it quashed his subpoenas to the insurance companies and admitted the testimony of two attorneys; and (7) when it denied his motion for recusal. Finally, Pierce contends sentencing error occurred. We affirm.

## STATEMENT OF THE FACTS

*Prosecution's Evidence*

*Witness Tomas Rios, M.D.*

Rios pled guilty to conspiracy as charged in count 1 and testified for the prosecution.

In the mid 1990's, while still a medical resident, Rios began moonlighting at a physician's group as a disability evaluator for Social Security claimants, where he met Dr. Lonnie Powell, a chiropractor. The physicians' group rented office space from Powell in Visalia, and Rios saw Social Security disability patients there two weekends a month.

During this time, Rios familiarized himself with the operations of medical corporations having a chiropractic partner, and between 1999 and 2002, Rios and Powell formed Physicians Medical Management Group (PMMG), which managed independently contracted physicians to provide medical services as secondary treating physicians for workers' compensation patients at various chiropractic locations throughout California.[5] Most of the chiropractors whose workers' compensation patients were seen by these

---

[5] Under the workers' compensation scheme, the definition of a "physician" includes a chiropractic practitioner. (Lab. Code, § 3209.3.) For clarity purposes, we will refer to medical doctors as "physicians" and chiropractic practitioners as "chiropractors."

independent contractor physicians were friends and acquaintances of Rios or Powell. The chiropractors were seeking physicians to provide medication and care for their workers' compensation patients.

As explained by Rios, in the workers' compensation system generally, the chiropractor (as primary treating physician) can provide therapy, but many patients need some type of pain medication, which a chiropractor cannot prescribe. The chiropractor would then refer the patient to a PMMG physician (as a secondary treating physician), who would come to the chiropractic clinic, do their own evaluation and prescribe medication if appropriate. The physician generated a report and signed it, a bill was then prepared, and the report and bill were sent out by PMMG to the workers' compensation insurance carriers. Payment was made by the carriers to PMMG.

Rios knew which various current procedural terminology (CPT) codes were related to the medical services provided and determined which CPT codes would be billed by PMMG for a physician's services. According to Rios, because the cases referred by chiropractors to the physicians involved nonsurgical muscular-skeletal injuries, the injuries were similar from patient to patient. As such, Rios "already" knew what treatment would be required for the physician to manage the patient, allowing Rios to predetermine what code was necessary to bill. Unless the physician corrected the report to indicate such services were not provided, it was billed as Rios predetermined.

Rios testified that there are five levels of examinations specified in the CPT billing codes, ranging from the most basic to the most complex. The report given to the physician would have a specific, predetermined statement on the level of care expected of him, such as a comprehensive medical examination or an intermediate medical consultation. The initial consultation could take anywhere from 30 to 60 minutes and the CPT billing code for that consultation was set at the highest level of service. Follow-up consults were scheduled for less time and billed for less. Rios acknowledged that he might not have specifically articulated to the physicians hired by PMMG that the

treatment level, depicted in the reports he showed them as examples, were necessarily the CPT codes that would be billed.

PMMG also created a formulary of medicines purchased by PMMG that could be dispensed by the consulting physician. The formulary was a collection of medications Rios predetermined would be used in the practice, although the independent contractor physician could also write a prescription for medication they deemed more appropriate. PMMG would purchase medications to be dispensed with an expectation of later repayment by the workers' compensation insurance carrier. Since 80 to 90 percent of the workers' compensation patients referred to the physicians suffered back pain, it was anticipated that the physicians would utilize the formulary of medicines that were available for dispensing. Rios testified that he expected the physicians to dispense medication, because "that's the reason why [the physician is] in the clinic in the first place."

In 2003, Rios began doing business with Pierce. By this time, Rios was not only actively engaged in PMMG, but he had also partnered with various other medical groups and clinics. Pierce had chiropractic practices in Avenal and Huron and was familiar with the PMMG business plan of placing a physician in a chiropractic clinic to serve as a secondary treating physician.

Rios and Pierce met to discuss forming rural health clinics in Avenal and Huron. Pierce provided the offices for the clinics as part of his contribution to the venture. Rios suggested a business similar to PMMG. Pierce was familiar with this type of consultation because he had treated workers' compensation patients and had physicians come to his office to examine and dispense medication to patients who needed it.

In January 2004, P&R was formed to operate as PMMG did. Rios was the 51 percent owner, Pierce owned 49 percent. Pierce was the incorporator of P&R and its president. Because Pierce knew many chiropractors, it was agreed he would market P&R services to them. A form lease was created for the physicians; they were to pay for each

day or half day of space they used at various chiropractic offices when seeing workers' compensation patients. Pierce met with prospective chiropractors to discuss the services P&R could provide; Rios's duty was to find physicians that, "in [his] judgment, have a working understanding of what a secondary treating physician would be."

At a May 2005 P&R shareholder's meeting, Pierce, as treasurer, reported that P&R "was doing very well and … presently has five (5) doctors that are doing examinations for chiropractors and writing reports. He advised that [P&R] is making a very good profit but could be doing much better…. [And] if the workers['] compensation insurance will start accepting their responsibility to their workers that he anticipates that [P&R] could become very profitable."

A company called Premier Interpreting and Support Services (Premier) handled a variety of tasks for P&R, including billing, scheduling the physicians, providing medical assistants for the physicians on site, and providing typing services to generate the final physician's report. Premier was owned on paper by Rios's sister Cecelia Cabangangan (one of the original codefendants), but the business was capitalized by Rios. Rios hired Veronica Aguayo as the office manager at P&R and Premier. She had previously been Rios's medical assistant and was familiar with his practice routine.

Rios directed Aguayo on how he would like to set the formulary, how to have an adequate supply of medications available to dispense, and how the physician's reports were to be generated. Rios directed Aguayo to tell the physicians their DEA registration numbers would be used to purchase medications they would be dispensing.

Rios created the template worksheets, used to generate typewritten reports, for the physicians to fill-out after they had completed an exam. Spaces in the template allowed the physician to note symptoms other than those set forth in various alternative template paragraphs. The reports were then transcribed using the template manual to create the report in narrative form. This was done in the Philippines by Rios's relatives, who were paid by Premier. Rios's relatives handled the transcribing for P&R, as well as for other

7.

medical groups and clinics owned by Rios. In the early stages of P&R, the finished reports were given to the physicians to review and sign; later the reports were scanned by a server with electronic signatures already affixed.

Patty Steck oversaw billing at Premier. She initially reported to Rios, who showed her what CPT codes to use for office visits, etc., and directed her on how to determine the price to bill for dispensed medication. At one point, Rios decided to "downcode" comprehensive consultations to intermediate ones because insurance carriers were either disputing the charges or down coding them on their own. Rios decided to accept the down coded payment rather than having the matter in dispute; Rios told Pierce about this.

Sometime before the search warrants were executed on April 15, 2008, Rios decided to wind down his practices, including the operation of P&R, and allow California Consultation Medical Corporation (CCMC), owned by Pierce and Yang, one of the contracted physicians with P&R (and original codefendant), to take over the P&R practice, including existing medication supplies, medical charts, and seeing P&R patients. Rios was to receive consideration for the assets P&R was transferring to CCMC.

*Witness Monica Murphy, M.D.*

Monica Murphy, previously a physician, was granted use immunity upon the prosecutor's request before her testimony. Following a conviction for tax evasion in 2003, Murphy was not able to practice on her own and was hired as a physician by Rios to work for Visalia Industrial and P&R. She later lost her medical license and worked for P&R as a medical assistant for about a year.

As a physician at P&R, Murphy dispensed medication to patients, medications which were based on a formulary that she did not have input into. P&R did not notify patients of the option to receive a prescription for medications they could use on their own, rather than having them distributed at the clinic. As a physician at P&R, Murphy did not think she could change the diagnosis of the patient made by the chiropractor.

8.

Initially, Murphy dictated a report of her visit with the patient, forwarded the dictation to Rios, Rios transcribed it into a report, and she then signed it, a process that took several months. Murphy did not have any documents in her possession to compare her original report with the final report. Later, Rios developed a template which generated the typewritten report. The signatures were affixed via electronic signature, which Murphy did not do herself. She did not have the capability to log onto the computer system to see the final report.

On the template, Murphy circled numbers to match preprinted language. She did not always have the guide book of CPT codes to know which numbers she was circling. Murphy testified that her schedule did not allow for a "comprehensive top-down review" of each patient, and if the final report reflected that such had occurred, it would not be true. Murphy was unfamiliar with the coding requirements for different CPT office visits or consultation codes. Murphy claimed she had very little interaction with Pierce and he never advised her on a medical issue.

*Witness Cynthia Jones, M.D.*

Cynthia Jones, M.D., worked for P&R as a physician for approximately two years, beginning in 2005. When she was hired by Rios, he explained that she would be using a template to help generate reports, but he did not discuss much in terms of the actual patient care she would be responsible for. She understood her "purpose" in that position was to dispense "a particular group of drugs," the formulary, which was "profitable when they billed the work[ers'] comp[ensation] company." She did not dispense all the drugs to every patient, and it was not until "later that [she] figured out that they had expected [her] to do that."

Jones was trained by Dr. Yang. Yang showed her how to complete the template that generated the final report. Yang told her to randomly circle different numbers of CPT codes for consecutive patients so that the reports would not all look the same. Yang

told Jones it was not really important what numbers were circled, so she circled them at random.

Jones acknowledged that she never did a case conference, a post-exam case conference with the chiropractor to discuss a patient's needs, although she always checked the template "yes" to indicate that a case conference had taken place. She thought either Aguayo or Yang most likely told her to do that. Jones also acknowledged that she never did a comprehensive consultation with a new patient, but she claimed she did not know if she circled certain numbers on the template that would indicate otherwise. There was no template language on the worksheet for an option of "no medications" dispensed.

Jones was not given the key to the template used until over a year after she started working for P&R. Once she received the key, she still circled numbers randomly. Jones met Pierce only twice and did not discuss billing with him.

*Witness Chi Hong Yang, M.D.*

Yang surrendered his medical license as a condition of his guilty plea to a conspiracy involving all named defendants charged in count 1. When Yang met Pierce, Pierce explained in general the physician consultation position and some of the paperwork involved. Pierce told Yang that Rios, as the physician who also had a law degree, would explain how to complete the form used to make a completed medical report. Yang would be paid per day or half day of work.

Yang then met with Rios, who explained more about the template and told him he did not have to worry about which paragraph numbers he circled. At P&R, Yang usually saw 10–15 patients a day, for around 20 minutes per patient. Yang testified he did not do comprehensive examinations, although he examined every patient carefully.

Yang's signature to the reports were affixed electronically, although Yang testified that, after he participated in a deposition in August of 2007, he was told to electronically

10.

sign the finished report personally.[6]  Yang did not feel it necessary to check the report with his records.

The longest Yang spent talking to a chiropractor about a patient while working at P&R was two minutes, and he never documented those conversations.  He spoke to the chiropractor for only about 20 percent of the patients he had seen.  Nevertheless, while working at P&R, Yang circled on the template that a case conference had been done on every case.  He also circled "reverse case conference," which would generate a report to the chiropractor that he had participated in a case conference.  He was told to do this by office manager Aguayo.

Yang also worked at the Huron and Avenal medical clinics, and claimed that, when he signed the contract to work at the clinics, he thought he was signing a contract to work for P&R.  Although he was the medical director of the clinic in Huron, Yang did not hire the physician assistants, Rios did.  Yang testified that it was Pierce who was his boss and he was the one who determined what the contents of the medical charts at the rural clinics should contain, but he was not certain who determined what medications to have on hand.  Aguayo told him he needed to have a separate DEA number to purchase medication for each rural clinic.

In late 2007, Yang and Pierce decided to form their own company which would eventually take over P&R.  Their company, CCMC, was incorporated in January 2008, with Yang owning 51 percent and Pierce owning 49 percent.  In this new business, Yang visited the same chiropractic offices he had previously visited for P&R and saw the same patients.  They used the same template that was developed at P&R in late 2007, and Yang personally signed the template used to generate reports, which were sent off for completion.

---

**6**    Yang participated in a deposition involving a claim filed by an employee against her employer and its workers' compensation carrier.  The deposition took place in two parts—the first in August of 2007 and the second in January of 2008.

During Yang's trial testimony, he was asked about the two days of depositions he participated in during the investigation of a workers' compensation case.[7] Yang testified that, after the first deposition session, Pierce told him he should state during the second session that he had always checked the patient charts before he signed them, which was not true. Yang testified that, while he did not want to lie, he needed a job and he did not want P&R to close, which Pierce said would happen if "things [did] not go well." Yang testified he made the untrue statement because he was asked to do so by Pierce.

During the second deposition session, an attorney, Michael Farley, provided by Pierce, was present with Yang. Pierce told Yang that Farley would be there because Yang was "so nervous" during the first deposition session. In anticipation of the second session, Yang stated he brought the medical billing code book with him and let Farley know that he had it. Farley told him to keep the code book in his "suitcase" and not to take it out before Farley told him to do so. Yang was asked about the code book during the deposition. When he began to answer, Farley stopped him and "beg[a]n to argue with the person in the deposition." Yang understood this to mean that he should not produce the code book, so he did not. Instead, Yang testified "I make a whole bunch of lie after that. I tell a lot of lie." One such lie was that he had taken the code book with him to each patient visit to help him circle the correct code numbers for the visit. Yang felt that this was what Farley wished him to do.

When Yang was given a copy of the deposition and asked to review and sign it, Yang spoke to Pierce about his lies during the deposition. Pierce told him he would consult with Rios, who also had a law degree, but he never heard from them about it again, and Yang signed the deposition as being accurate.

A search warrant was executed on April 15, 2008, while Yang was working at a chiropractic office in San Leandro through CCMC. After the search, Yang called Pierce,

---

**7**      See footnote 6, *ante*.

because he was his boss. The following day, Yang and Pierce met Farley. Pierce told Yang that CCMC could not continue doing business because their "computer[s] and everything" were seized, and asked for Yang's company credit card and car, which he returned. Pierce told Yang to get an attorney and not to discuss the issues with anyone.

Approximately a year later, Cathy Pierce asked Yang to sign 126 patient charts for consultations that took place before April 15, 2008, so they could be billed. Yang eventually complied. CCMC was eventually dissolved in December 2009.

*Witness Veronica Aguayo*

Aguayo testified she began as a medical assistant for Rios and chiropractor Steven Booth. She then went to work with Rios at another of his corporations and in late 2003 began at Premier as the office manager. Aguayo and Rios's sister Cabangangan, who owned Premier, hired billers for Premier, including Patty Steck. It was Cabangangan who gave the billers directions on how to bill. When Rios and Pierce created P&R in 2004, Aguayo became the office manager there. In that position, she worked as a medical assistant and recruited physicians for the various companies. She also maintained the schedule for the medical assistants and ordered medications.

In her position at P&R, Aguayo had contact with Pierce "[a]lmost daily," and often accompanied him to various clinics around the state. She also had frequent contact with Pierce's wife Cathy, who did the bookkeeping and accounts payable for P&R. Aguayo and Pierce discussed collections, the schedule, and medications. Regarding collections, Pierce wanted to know what P&R collections were each day. Aguayo faxed Pierce information on how well insurance carriers were paying in response to bills issued by Premier. The two talked at times about how to increase the amount of money paid by the carriers. Pierce provided Aguayo with a form he had used in his own chiropractic offices which he wanted the billers at Premier to use. The form was to be sent out with the bills and explained why certain codes needed to be paid, resulting in quicker payments. Pierce expressed to Aguayo how he wished the billing to be done, and she

13.

would instruct the billers to do so. In January of 2008, Aguayo sent a fax to an attorney, on behalf of Pierce, asking whether P&R could continue to bill certain medical procedural codes.

After being asked by Pierce to do so, Aguayo began tracking every individual patient to see what the insurance carrier was or was not paying for. This led to color coding patient files to more easily determine which carriers paid and which did not.

According to Aguayo, when P&R began, the whole set of medications, or formulary, would be given to every patient. With information gathered from the color-coding system, Pierce directed Aguayo to give each individual patient only the medications his or her insurance was paying for. Pierce explained to Aguayo that this was necessary to keep P&R profitable. No billing was done on P&R's behalf after May 15, 2008.

*Witness Edith Cuartas*

After law enforcement executed the search warrant on the businesses and homes associated with P&R in April 2008, Premier dissolved, and a few months later, P&R closed. On February 1, 2009, Pierce and Rios on behalf of P&R contracted with Edith Cuartas, owner of Alpha Billing and Collection (Alpha), to rebill only for the medications P&R dispensed earlier. Pierce and Rios gave Cuartas an accounts receivable report for P&R and the amount was "in the millions." Alpha began rebilling for P&R in 2009 and continued through 2012, collecting between $1 and $2 million dollars for P&R.

## Defense

Pierce testified in his own behalf. He had been a chiropractor for many years in Huron and Avenal. After he was injured, it became more difficult for him to treat patients, and he became interested in converting his chiropractic offices into rural health clinics.

Pierce did not dispute that P&R, in practice, was operating in a manner to defraud workers' compensation insurance carriers. However, he claimed ignorance of any fraudulent billing practices and that he had no intent to defraud. Pierce testified that his role was to market the P&R model to chiropractors and pay expenses to keep the business running, and that it was Rios who was responsible for all medical aspects of P&R, including what medical services P&R would provide and bill for. While Rios had explained to him how P&R would operate, Pierce took no steps to educate himself on the details of the P&R operation on the medical side.

Pierce placed much of the blame with the physicians who were contracted to work at P&R, but he stated that he "never thought they would be dishonest." Pierce claimed he did not know the physicians were not conferring with the chiropractors about the patient's care and were not truthful in noting the level of care provided or amount of time spent with the patients. As to the later rebilling for medications, Pierce, relying on Rios, believed the medications were actually dispensed because of tracking forms. Rios had also told him physicians would not dispense medications without doing an examination.

**DISCUSSION**

I. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT OVERRULED PIERCE'S DEMURRER TO COUNT 1 OF THE AMENDED INDICTMENT?

Pierce argues the trial court prejudicially erred in overruling his demurrer to the conspiracy count in the amended indictment. We disagree.

*Procedural Background*

*Original Indictment*

In June 2012 an indictment was filed charging Pierce and then six codefendants with one count of conspiracy to commit insurance fraud, with 127 overt acts alleged and various monetary enhancements, as well as 21 counts of false workers' compensation insurance billings.

15.

*First Demurrer*

In October 2012, codefendant Lewis filed a demurrer claiming the indictment did not substantially conform to the provision of sections 950 and 952 and for uncertainty, in violation of section 1004, subdivision (2). Pierce joined in the demurrer.

Argument was heard in February 2013. Lewis's defense counsel argued that the substantive counts other than the count 1 conspiracy in the indictment did not allege a "venue." As to all counts, it was alleged the indictment "straddled" the statute of limitations (i.e., some counts occurred within the three-year statute of limitations period and some were outside the statute of limitations). As to count 1, specifically, counsel argued that, if there was a conspiracy, there was more than one. The prosecutor disagreed, arguing that the grand jury alleged there was an ongoing criminal conspiracy between the defendants and the overt acts spanned the entirety of that time period, from 2003 to 2012.

Lewis's defense counsel also argued that, since the pleading was in the disjunctive, it was subject to demurrer for uncertainty, and he was "at a loss to know just exactly what it is that Dr. Lewis is charged with." The prosecutor again disagreed, stating that count 1 might actually give "too much information," as insurance fraud can be completed by a "plethora of avenues." As written, the prosecutor alleged, it "actually clarifie[d] specifically" how the insurance fraud was carried out.

In March 2013, the trial court issued its ruling. It overruled the demurrer as to counts 2–21 based upon the issue of "jurisdiction/venue" and statute of limitations. It sustained the demurrer as to counts 2–21 on the grounds of uncertainty, with leave to amend to allow the prosecutor to file an amended indictment.

In overruling the demurrer to count 1 on the statute of limitations issue, the trial court noted that defense counsel's argument was based upon evidentiary matters and assumptions based on evidentiary matters. The trial court cited *People v. Williams* (1979) 97 Cal.App.3d 382, which the trial court stated, "clearly restricts the review [of a

16.

demurrer] for purposes of a statute of limitations analysis to the face of the pleading." "Since a demurrer tests only defects appearing upon the face of the accusatory pleading, the issue is limited to whether the indictment adequately alleged that the conspiracy continued [within a certain] time …. If so, defendants' first contention was not a valid basis for demurrer." (*Id.* at p. 388.)

Restricting its review to the face of the pleadings, the trial court ruled that the grand jury found the named defendants engaged in one conspiracy among themselves and other unknown/unnamed coconspirators in violation of section 182, subdivision (a)(1); that the conspiracy embraced the entire time period from November 5, 2003 to April 30, 2012; that the grand jury found six listed statutorily prohibited objectives of the conspiracy; and that "said conspirators" "committed the following acts," incorporating by reference the 127 alleged overt acts; and that some of the overt acts occurred within the three-year limitations period and some outside of that period.

As to the issue of uncertainty in the alleged overt acts in count 1, the trial court found that the allegations did not appear on the face to be inconsistent, and if there were some immaterial inconsistencies or ambiguities, those questions would be better addressed in discovery. "Such disagreements or questions are not a basis for a demurrer so long as the pleading meets due process requirements of providing [d]efendants notice of the crimes they are accused of."

*Amended Indictment*

The amended indictment was filed March 15, 2013. It included the same number of overt acts and substantive counts, although counts 2–21 now referred to "on or about" a specific date, rather than a time period.

*Second Demurrer*

In April 2013, codefendant Lewis filed a demurrer to the amended indictment. He again raised the issue that the evidence presented before the grand jury showed multiple conspiracies and the indictment did not give notice of which conspiracy charged in count

17.

Lewis was a part of. Specifically, Lewis argued that the rebilling of medication costs was done by P&R alone and he had no ownership in or involvement with P&R. Only Rios and Pierce were involved with P&R. Therefore, he argued the grand jury should have been instructed to determine if there was a single or multiple conspiracies. Pierce filed a joinder in the demurrer.

At the May 2013 hearing on the demurrer to the amended indictment, counsel for Lewis again argued that the amended indictment's wording "disjunctively pled" more than one count of conspiracy in count 1. Counsel emphasized that this was the grand jury's indictment and "they could have very well charged more than one … conspiracy." The prosecutor argued to the contrary, stating that the wording in the indictment did not allege a different crime, but that it was "simply the specific mechanism among a plethora of options, all of which are prohibited by the Penal Code, that all ultimately distill down to cheating and defrauding insurance carriers." No further argument occurred, and the trial court overruled the demurrer, finding only a single conspiracy was charged in count 1.

*Pierce's Contention*

Pierce now contends that the trial court's overruling of the demurrer to count 1 of the amended indictment caused him substantial prejudice. As argued by Pierce on appeal, the issues raised by the demurrer resurfaced at his trial. After testimony about the various corporations Pierce was involved in with others, the prosecution, on defense motion, elected to proceed only against activities Pierce was involved in as part of P&R. Later still, the prosecution elected to present to the jury only 13 of the original 127 overt acts. In seven of these 13 alleged overt acts, the applicable time period was between November 1, 2003, and April 30, 2012; in three the time period was between January 1, 2004, and April 30, 2012; in two it was between January 1, 2010, and March 1, 2011; and in one it was on or about December 4, 2010.

18.

Pierce contends 10 of the alleged overt acts "straddled the statute of limitations by several years" and all could have pertained to the rebilling, which Pierce argues was allegedly a "separate legal conspiracy." As such, Pierce contends, he "was prejudiced by lack of notice of what those overt acts pertained to because single overt acts cannot logically span several years."

Pierce contends the jury was confused as well, citing a question submitted during deliberation in which the jury asked for clarification on overt acts 1–10 in the verdict forms, which showed dates of occurrence prior to 2009, and how they were to reconcile that with the jury instructions, which stated, in part, that "[y]ou must all agree that at least one alleged overt act was committed … after June 3, 2009."[8] The trial court instructed the jurors that, in order to find Pierce guilty, they had to agree that an overt act was done by a member of the conspiracy, was "completed" sometime after June 3, 2009, and while Pierce was a member of the conspiracy. Pierce contends this does not help in the situation where the pleading alleged he was involved in more than one conspiracy, namely the P&R billings through Premier before P&R and Premier closed, and P&R rebilling efforts through Alpha after P&R and Premier closed.

*Applicable Law and Analysis*

A demurrer is a procedure that raises an issue of law as to the sufficiency of the accusatory pleading. Section 1004 expressly limits demurrers to defects appearing on the face of the accusatory pleading, and the grounds specified in that section are exclusive. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1090–1091, fn. 10; *People v. Muniz* (1970) 4 Cal.App.3d 562, 568, fn. 3; *People v. McConnell* (1890) 82 Cal. 620, 621.) A

---

**8**      The paragraph in the jury instructions which the jury questioned reads in its entirety: "You must all agree that at least one alleged over act was committed in California in furtherance of the conspiracy and after June 3, 2009 by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts."

defendant may demur when the accusatory pleading does not substantially conform to the provisions of sections 950, 951, and 952 (§ 1004, subd. (2)) and when it appears on the face of the accusatory pleading that more than one offense is charged, except as provided in section 954 (§ 1004, subd. (3)). A demurrer is not a proper means to test the sufficiency of evidence. (*People v. Williams, supra,* 97 Cal.App.3d at p. 391.)

We agree with the trial court's ruling that only one conspiracy was charged. An accused is "'entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, such details being furnished him by the transcript of the testimony upon which the indictment or information is founded.'" (*People v. Pierce* (1939) 14 Cal.2d 639, 646; see *In re Jesse P.* (1992) 3 Cal.App.4th 1177, 1183–1184.) The evidence presented by the grand jury proceedings showed there was one overarching conspiratorial objective to defraud workers' compensation insurance carriers.[9] While there were numerous medical corporations formed by various physicians and chiropractors, the evidence showed that these physicians and chiropractors, with knowledge of one another, formed and used these various entities to fraudulently bill and profit from the insurance monies.[10]

Even assuming arguendo that the trial court erred in overruling the demurrer on the grounds of insufficient notice as to which conspiracy Pierce was a part of, we find no prejudice. "A judgment will not be reversed on the ground that two separate conspiracies were charged as one, unless the appellant shows that he was prejudiced thereby."

---

[9] The grand jury transcripts consist of 13 volumes of reporter's transcripts.

[10] As an example of this scheme, respondent referenced codefendant Lewis's connections with Pierce and P&R. The grand jury testimony showed that Pierce filed articles of incorporation for Central California Sportsmedicine & Orthopaedics Medical Corporation (CCSM) on September 20, 2006. The listed directors, officers, and shareholders of CCSM were Pierce and Lewis. The listed address on CCSM checks and corporate documents and forms was Pierce's home address in Lemoore. Checks from insurance carriers, made payable to CCSM, were deposited by "P&R Med-Legal Medical Corporation." One such check, in particular, was issued on January 21, 2010.

(*People v. Elliot* (1978) 77 Cal.App.3d 673, 685.) Section 960 of the Penal Code provides: "No accusatory pleading is insufficient … by reason of any defect or imperfection in the matter of form which does not prejudice a substantial right of the defendant upon the merits". (See *People v. Schoeller* (1950) 96 Cal.App.2d 61, 64 ["a judgment will not be reversed because of an error in the form of the indictment 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice'"].)

There was substantial evidence at trial, particularly from Yang, that Pierce had knowledge of P&R's fraudulent practices and that he intended to defraud the workers' compensation insurance carriers. The later rebillings and collection efforts through Alpha were for the same agreed upon objective of defrauding workers' compensation insurance carriers, and for the same previously billed dispensed medications through P&R. As noted in *People v. Skelton* (1980) 109 Cal.App.3d 691, 718, overruled on other grounds in *People v. Figueroa* (1986) 41 Cal.3d 714, 730–731, and citing *United States v. Hobson* (1975) 519 F.2d 765, 775, "The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy." (*Skelton, supra,* at p. 718.) Here, while coconspirators performed different functions, their activities overlapped to carry out one single conspiracy. The evidence clearly shows one overall scheme. Substantial evidence supports the argument and verdict that there was one single conspiratorial objective—defrauding workers compensation insurance companies. The fraudulent business model for P&R's operation was developed and "perfected" over the years by Rios with his other companies, and put into operation in 2004 with Pierce, when they formed and ran P&R.

We find no prejudicial error by the trial court in overruling the demurrer and reject Pierce's claim to the contrary.

## II. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT REFUSED TO STRIKE REFERENCE TO SECTION 550, SUBDIVISION (a)(5) FROM THE CONSPIRACY CHARGE AS SURPLUSAGE?

Pierce contends the trial court prejudicially erred in not striking section 550, subdivision (a)(5) (preparing a report with intent to present it in support of fraudulent claim) from the conspiracy charge as surplusage (i.e. not relevant to the workers' compensation issues). We disagree.

*Procedural Background*

The amended indictment alleged that Pierce conspired to commit insurance fraud pursuant to section 550, subdivision (a), subsections (1), (2), (5), (7), and (8) and pursuant to Insurance Code section 1871.4, subdivision (a)(2). A violation of section 550, subdivision (a), subsections (1), (2), and (5), is designated as a felony, whereas a violation of subsections (7) and (8) is either a misdemeanor or felony wobbler. (§ 550, subd. (c)(1) and (2)(A)(B).)

Prior to trial, Pierce joined codefendant Lewis's motion to "strike surplusage from amended indictment," in which Lewis argued that subdivision (a)(1), (2), and (5) of section 550 "do not apply to claims for worker's compensation health care benefits," due to subdivision (a)(10). The district attorney filed an opposition. The trial court, in a written ruling, granted the defense motion as to section 550, subdivision (a)(1) and (2), but denied the motion as to subdivision (a)(5).

*Applicable Law and Analysis*

This issue presents a question of statutory interpretation, which we determine independently. (*Simpson v. Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 350.) Our function in interpreting a statute is to ascertain legislative intent so as to effectuate the statute's purpose. (*Rudd v. California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 952; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698.) In determining legislative intent, we look first to the statute's words and give them their usual and ordinary meaning (unless a special

22.

meaning is specifically called for). (*California Teachers Assn., supra,* at p. 698; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) "'When the language is clear and unambiguous, there is no need for construction. [Citation.] When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids,'" including the legislative history, the statutory scheme of which the statute is a part, and similar statutory schemes. (*Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562, quoting *People v. Woodhead* (1987) 43 Cal.3d 1002, 1007–1008.)

Section 550 criminalizes the act of knowingly preparing or presenting to an insurance company a false claim for benefits. Section 550 provides:

> "(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
>
> "(1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.
>
> "(2) Knowingly present multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud.
>
> "(3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim.
>
> "(4) Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damage, or conversion of a motor vehicle, a motor vehicle part, or contents of a motor vehicle.
>
> "(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
>
> "(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

"(7) Knowingly submit a claim for a health care benefit that was not used by, or on behalf of, the claimant.

"(8) Knowingly present multiple claims for payment of the same health care benefit with an intent to defraud.

"(9) Knowingly present for payment any undercharges for health care benefits on behalf of a specific claimant unless any known overcharges for health care benefits for that claimant are presented for reconciliation at that same time.

"(10) For purposes of paragraphs (6) to (9), inclusive, a claim or a claim for payment of a health care benefit also means a claim or claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code."

The only issue before us is whether the trial court erred when it found section 550 subdivision (a)(5) applicable to workers' compensation claims and denied Pierce's motion to strike the allegation. As noted, in section 550, subdivision (a)(10), cited above, the statute specifically defines, "for purposes of paragraphs (6) to (9) inclusive, a claim for payment of a health care benefit" includes a "claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code." (See *People ex rel. Monterey Mushrooms, Inc. v. Thompson* (2006) 136 Cal.App.4th 24, 30.) Pierce argues that, because section 550, subdivision (a), subsections (6)–(10), includes workers' compensation claims as "health care benefits," and subsection (5) does not, that subsection was not meant to include the alleged workers' compensation fraud claim against him and should have been struck by the trial court.

In a lengthy written ruling, the trial court addressed the legislative history of section 550, subdivision (a), which was added by statute in 1992, and the 1993 amendment to it of what is now subsection (10), which specifically clarified that the term "health care benefits" included workers' compensation benefits. As stated by the trial court, while the Legislature repeatedly documented its understanding that existing law already criminalized this type of workers' compensation fraud, the addition of subsection

24.

(10) did not intend to change the law but only to clarify that the term "health care benefits" included workers' compensation benefits.

The trial court, finding that section 550, subdivision (a) subsections (6) and (8) appeared closely related to subsections (1) and (2), with the former governing "health care benefits" and the latter "loss or injury," struck the subsection (1) and (2) allegations. However, it found that subsection (5) "refers to neither 'loss of injury' nor 'health care benefits.'" Instead, the trial court found subsection (5) prohibited the preparation, making or subscribing of "'*any* writing'" with the intent to present it or allow it to be presented in "'support of *any* false or fraudulent claim.'" Therefore, the crime under subsection (5) is not in making a claim, or submitting multiple claims, but it is one of "*preparation*, etc." of a writing with the intent of allowing the writing to be used for the specified purpose.

We agree with the trial court that subsection (5) makes criminal such preparation, regardless of whether the proposed claim violates any of the other subsections of section 550, subdivision (a), or other statutes defining or proscribing false or fraudulent claims. We agree, as noted by the trial court, that subsection (5) is the only portion of section 550, subdivision (a) that specifically relates to the preparation of documents, and it was intended by the Legislature to apply to all fraudulent workers' compensation claims.

In any event, assuming arguendo that the trial court should have struck the section 550, subdivision (a)(5) allegation, Pierce can show no prejudice. The remaining allegations against him in the count 1 conspiracy to commit insurance fraud (§ 182, subd. (a)(1)), was that Pierce did so by knowingly presenting a false claim or multiple false claims for health care benefits (§ 550, subd. (a)(7) & (8)) and knowingly presenting any false or fraudulent material statement in support of a claim for workers' compensation benefits (Ins. Code, § 1871.4, subd. (a)(2)). The jury found count 1 true based on one or more of the alleged overt acts, none of which involved the preparation of a fraudulent

25.

document, as alleged in section 550, subdivision (a)(5). Thus, even had the section 550, subdivision (a)(5) allegation been struck, Pierce would still have been found guilty.

III.    DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT DENIED PIERCE'S MOTION TO COMPEL AN ELECTION BETWEEN CONSPIRACIES AT THE CLOSE OF THE PROSECUTION'S CASE?

Pierce next contends the trial court prejudicially erred when it denied his motion to compel an election between what he alleged were separate conspiracies. We disagree.

*Procedural Background*

At the conclusion of the People's case in chief, Pierce argued that the evidence showed multiple medical corporations and more than one conspiracy, and he moved to compel the prosecutor to elect which medical corporation to be the bases of the conspiracy charge. Because the losses presented were monies paid only to P&R's taxpayer identification number, the prosecutor stated the conspiracy charge would be limited to P&R's billing and reports.

Pierce then argued that the prosecutor alleged P&R was involved in two separate conspiracies: one consisting of the P&R operation prior to the execution of the search warrants in April 2008 and the other consisting of the 2009 rebillings or collection efforts for P&R billings for earlier dispensed medications. The prosecutor disagreed, stating there was but one conspiracy, which was to "defraud the insurers." The trial court agreed with the prosecution, that the billing activities after the search warrants were "part and parcel" of the P&R conspiracy. The trial court stated that Pierce, however, would not be precluded from arguing separate conspiracies and applicability of the statute of limitations to the jury.

*Applicable Law and Analysis*

Conspiracy is a crime distinct from the substantive offense that is its object; it does not require commission of the substantive offense (target offense). (*People v. Swain* (1996) 12 Cal.4th 593, 599–600; *People v. Morante* (1999) 20 Cal.4th 403, 416–417.)

26.

The conspiratorial agreement is itself the essence of the crime and is what it seeks to punish. (*People v. Johnson* (2013) 57 Cal.4th 250, 258.) Conspiracy is "a continuing offense while the agreement continues." (*People v. Briones* (2008) 167 Cal.App.4th 524, 529; see *People v. Becker* (2000) 83 Cal.App.4th 294, 297–298 [conspiracy a continuing offense "because by its nature it lasts until the final overt act is complete"].) And, as explained in *People v. Jones* (1986) 180 Cal.App.3d 509, 517, "[a] conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances."

The trial court instructed the jury with CALCRIM No. 415, which sets forth the elements of the crime of conspiracy:

> "One, the defendant intended to agree and did agree with one or more of the alleged other named or unnamed coconspirators to commit one or more of these specified crimes; number two, at the time of the agreement, the defendant and one or more of the alleged other named or unnamed members of the conspiracy intended that one or more of them would commit one or more of these specified crimes; number three, the defendant or one or more of the alleged other named or unnamed coconspirators or all of them, committed at least one of the following overt acts to accomplish the object of the conspiracy."

Here, the evidence showed that Pierce and Rios, among others, agreed to defraud workers' compensation insurance carriers by forming a medical corporation, P&R, that contracted with physicians to dispense medications to workers' compensation patients with little or no regard for medical need; to prepare the medical reports stating reasons to support the medical appropriateness and necessity of the medications; and then billing the insurance carriers for the services not performed and medications not necessarily called for. After P&R and Premier closed, due to execution of the search warrants, Pierce and Rios hired Alpha to rebill the existing P&R bills that had not been previously settled or resolved. At trial, Rios acknowledged that the bills sent out by Alpha had been billed

before. Cuartas, who ran Alpha, also testified she submitted these bills in attempt to collect on previous debt owed. As such, the rebillings and collection efforts by Alpha were for the same agreed upon objective of defrauding workers' compensation insurance carriers.

As noted previously, "The test is whether there was one overall agreement among the various parties to perform various functions in order to carryout the objectives of the conspiracy. If so, there is but a single conspiracy." (*People v. Skelton, supra,* 109 Cal.App.3d at p. 718.) Here, the evidence was clear that there was but one single conspiracy tied together as stages forming a larger all-inclusive combination, all directed to achieving a single unlawful end or result. (*People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453.) There was no error on the part of the trial court in rejecting Pierce's motion to compel an election between conspiracies.

IV.     DID THE TRIAL COURT ERR IN DENYING PIERCE'S MOTION FOR ACQUITTAL?[11]

Pierce contends that the trial court erred in denying his motion for reconsideration of acquittal and motion for acquittal as to count 1, because the evidence was insufficient to corroborate the testimony of Yang, an accomplice. We disagree.

*Procedural Background*

As noted in the statement of the case, at the close of the prosecution's case, the trial court denied Pierce's motion for acquittal as to count 1, as well as counts 2, 4, 5, 12, 14, 18, and 21. It granted Pierce's motion for acquittal as to all of the monetary enhancements attached to count 1, and as to substantive counts 3, 6, 7, 8, 9, 10, 11, 13, 15, 16, 17, 19, and 20.

---

[11]     The People's motion to augment the record filed March 14, 2019, on this issue is deemed moot as the superior court augmented the record as requested.

28.

Several days later, Pierce filed a motion for reconsideration of the trial court's partial denial for acquittal at the close of the prosecution's case, as well as a new motion for acquittal at the close of all evidence. Grounds for both motions alleged Yang was an accomplice as a matter of law and his testimony should have been disregarded as it was not sufficiently corroborated. Following a hearing on the motions, the trial court denied both.

The jury subsequently acquitted Pierce of counts 2, 4, 5, 12, 14, 18, and 21, and found him guilty on count 1 only, conspiracy to commit insurance fraud.

*Standard of Review*

"[T]he court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." (§ 1118.1)

> "In determining whether the evidence was sufficient either to sustain a conviction or to support the denial of a section 1118.1 motion, the standard of review is essentially the same. [Citation.] '"[W]e do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility."' [Citations.] Notably, however, '[r]eview of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point.' [Citations.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1182–1183,

29.

abrogated on another point in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 )

*Applicable Law and Analysis*

It is undisputed that Yang, who was originally subject to prosecution for the identical offenses charged against Pierce, was an accomplice. (§ 1111.) "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense …." (*Ibid.*) The accomplice's testimony or that of another accomplice cannot supply the requisite corroboration. (*People v. Whalen* (2013) 56 Cal.4th 1, 55, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17.) "'Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.]'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 95 (*Manibusan*).) The corroborating evidence need not establish every element of the offense nor corroborate the exact facts or "every fact to which the accomplice testifies." (*Whalen, supra,* at p. 55.) "'It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth."'" (*Manibusan, supra,* at p. 95.) In contrast, "[i]ndependent evidence that corroborates portions of the accomplice's testimony, but which does not tend to connect the defendant to the crime, is not enough by itself to constitute sufficient corroboration …." (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 656.) Nonetheless, evidence corroborating details of the crime "may form part of a picture [from which] the jury may be satisfied that the accomplice is telling the truth" (*id.* at p. 659) when viewed "*in addition* to other evidence tending to connect the defendant to the crime." (*Id.* at pp. 657, original italics.)

Through Yang's testimony, the jury learned that Yang, a physician, met Pierce, who explained in general the physician consultation position he was interested in and some of the paperwork involved. Yang would be paid per diem. Pierce told Yang that

Rios would explain how to complete the form used to make a completed medical report. Yang then met with Rios, who explained more about the template, and told him he did not have to worry about which paragraph numbers he circled. At P&R, Yang usually saw 10–15 patients a day, for around 20 minutes per patient. Yang testified that he did not do comprehensive examinations, although he examined every patient carefully. The longest Yang spent talking to a chiropractor about a patient while working at P&R was two minutes, and he never documented those conversations. He spoke to the chiropractor about 20 percent of the patients he had seen. Nevertheless, while working at P&R, Yang circled on the template that a case conference had been done on every case. He also circled "reverse case conference," which would generate a report to the chiropractor that he had participated in a case conference. He was told to do this by office manager Aguayo.

In early 2008, Yang and Pierce formed CCMC which would eventually take over P&R, with Yang owning 51 percent and Pierce owning 49 percent. In this new business, Yang visited the same chiropractic offices he had previously visited for P&R and saw the same patients. They used the same template that was developed at P&R in late 2007. CCMC continued until the business was searched pursuant to warrant on April 15, 2008. Approximately a year later, Cathy Pierce asked Yang to sign 126 patient charts for consultations that took place before April 15, 2008, so that they could be rebilled.

During Yang's testimony, he was asked about the two days of depositions he participated in in August of 2007 and January of 2008. The depositions were taken as part of an action brought by a workers' compensation claimant against her employer and State Farm. Yang testified that, after the first deposition session, Pierce told him he should state during the second session that he had always checked the patient charts before he signed them, which was not true. Yang testified that, while he did not want to lie, he needed a job and he did not want P&R to close, which Pierce said would happen if

31.

"things [did] not go well." Yang testified that he made the untrue statement because he was asked to do so by Pierce.

Attorney Michael Farley was present with Yang during the second deposition session. Farley was provided by Pierce because Yang was "so nervous" during the first deposition. In anticipation of the second deposition session, Yang stated that he brought the medical billing code book with him and let Farley know that he had it. Farley told him to keep the code book in his "suitcase" and not to take it out before Farley told him to do so. During the deposition, Yang was asked about the code book. When he began to answer, Farley stopped him and "beg[a]n to argue with the person in the deposition." Yang understood this to mean that he should not produce the code book, so he did not. Instead, Yang testified "I make a whole bunch of lie after that. I tell a lot of lie." One such lie was that he had taken the code book with him to each patient visit to help him circle the correct code number for the visit. Yang felt that this was what Farley wished him to do.

When Yang was given a copy of the deposition and asked to review and sign it, Yang spoke to Pierce about his lies during the deposition. Pierce told him he would consult with Rios, who also had a law degree, but he never heard from them about it again, and Yang signed the deposition as being accurate.

In its ruling denying the motion for reconsideration on acquittal of count 1, the trial court noted that, at the time the prosecution rested, which was when the original motion for acquittal was filed, Yang's testimony that Pierce had requested he lie in the deposition had been corroborated by David Torres, Yang's attorney. Torres, who was present while Yang testified, himself testified that during a conversation in early 2013, when he first began representing Yang, Yang told him he had been given direction by Pierce to lie in the deposition and that he had done so. When asked on cross-examination what Yang had said he had been asked to lie about, Torres stated, "it was basically with respect to the policy and procedures that [were] taking place at the corporation." When

asked what Yang said he was specifically asked to testify falsely about, Torres stated he did not recall, "but the substance of what that conversation was was that he was asked to testify falsely by Dr. Pierce."

Pierce contends that the trial court erred when it relied on the testimony of Attorney Torres to corroborate Yang's testimony that he had been asked to lie by Pierce in his deposition, because Torres could not remember exactly what that lie was. However, as noted above, corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. (*Manibusan, supra,* 58 Cal.4th at p. 95.) Evidence that Yang was told by Pierce to lie about policies and procedures at P&R, without going into specifics, is sufficient.

In any event, the trial court stated there was also circumstantial evidence of "some contacts between [Pierce] and [Premier]" to corroborate Yang's testimony as well. As noted previously, while working at P&R, Yang circled on the template that a case conference had been done on every case, as well as a "reverse case conference," which would generate a report to the chiropractor that he had participated in a case conference, even though he rarely actually spoke to the chiropractors. He was told to do this by Premier office manager Aguayo. Aguayo had testified that Pierce, whom she spoke with almost daily, expressed to Aguayo how he wished the billing to be done. It can be assumed from this that Pierce instructed Aguayo to have the physicians circle the template codes indicating a case conference and reverse case conference were done on each patient, even when in fact they had not.

The trial court also considered the testimony of Mary Gillette[12], who was present during Yang's depositions. The trial court stated that, while her testimony "by itself" did not corroborate Yang's testimony, it helped "in the context of all the other circumstantial

---

[12]    In the reporter's transcript, the trial court refers to a witness, "I think her name was Ms. Jewett, the woman who was present at the depositions." A search of the record reveals that the trial court was referring to Mary Gillette.

evidence." Gillette, a claims representative for State Farm Insurance, appeared as a representative for State Farm at the first deposition session of Yang in August 2007 and the second session in January of 2008. At Pierce's trial, Gillette testified that State Farm, inter alia, processed workers' compensation bills for P&R. When investigating one claim, State Farm received a bill for reimbursement for a workers' compensation claimant, and the claimant indicated she had never seen Yang, although the billings stated she had. In the first deposition session, State Farm attempted to obtain additional documentation that this claimant had been seen by Yang, such as handwritten notes taken by the physician during the injured workers' examination. Yang said he could only provide notes for some of the visits and indicated that P&R maintained the complete patient file. Gillette obtained a subpoena for a copy of the entire file, but was not able to obtain the file at the P&R address, and was told there that they did not have the record, but Yang did. When Gillette asked to see the manager, Gillette was asked to leave.

During the second deposition session, Yang had a briefcase with him, which Gillette assumed contained the additional claim file documents and a copy of the coding file manual she had requested. Yang started to put the briefcase on the table, but he was instructed by Attorney Farley to put the briefcase under the table and told they would pull it out if needed. The briefcase was not retrieved during the course of that deposition session. Gillette noted that, during the second deposition session, Yang was more reserved and "very reticent" about answering questions, frequently looking to Farley before answering. Gillette also stated that, at times, Farley "aggressive[ly]" answered substantive questions posed to Yang. Farley would then request that Yang adopt the statement Farley had made. One such answer from Farley came after a question concerning the coding manual.

A review of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point. (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1183.) Here the evidence of

34.

corroboration of Yang's testimony is sufficient to find that the trial court did not err in its denial of Pierce's motion for reconsideration of acquittal on count 1.

Pierce also argues that the trial court erred when it denied his motion for acquittal made at the conclusion of the case. Again, we disagree.

In ruling on Pierce's motion for acquittal, the trial court stated that if "found sufficient corroboration at the time the People rested," but also that its ruling would not change following the defense. As stated by the trial court:

> "At the very least, I would characterize [Pierce's] testimony as demonstrating a higher level of knowledge with respect to, at least, some of the goings on at P&R than was evident during the People's case in chief. [¶] I think it's up to the jury to determine what exactly that higher level of knowledge was and what conclusions they can draw from it. [Pierce] admitted that he talked to Dr. Yang at the time of the deposition and that the subject matter was specifically the deposition itself and the inquiry that was represented by the deposition. [¶] I think that's strong evidence of corroboration. The People mentioned in their argument the marketing materials that were seized from [Pierce's] home and there certainly was testimony elicited that would indicate that [Pierce] had a higher level of knowledge about the operations and the structure and the business plan, business model of P&R, a higher level than was apparent from the People's case in chief."

Issues of credibility are for the jury to decide. (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1183.) We find no error on the part of the trial court in denying Pierce's motion for acquittal at the conclusion of the case.

V.    DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR IN JURY INSTRUCTIONS GIVEN AND REFUSED?

Pierce next contends the trial court prejudicially erred when it failed to give a requested unanimity instruction as to what crime(s) he conspired to commit. He also returns to the issue of whether there was more than one conspiracy and contends the trial court was required to give an instruction on such. We disagree.

*Procedural Background*

During the jury instruction conference, defense counsel requested the trial court instruct with a modified version of CALCRIM No. 415, which included the following language as to the count 1 conspiracy to commit insurance fraud charge:

> "The People allege that the defendants conspired to commit the following crimes: knowingly presenting a false or fraudulent material statement in support of a claim for payment of a workers compensation health care benefit, knowingly presenting a claim for a health benefit not used by or on behalf of the claimant, and knowingly presenting multiple claims for payment of the same health care benefit with the intent to defraud. You may not find a defendant guilty of conspiracy unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, *and you all agree which crime the defendant conspired to commit….*" (Italics added.)

At issue was the italicized wording, which defense counsel argued was necessary. The trial court appeared to agree and was puzzled why its version of the instruction did not include that wording. The prosecution, however, insisted that the wording was not necessary because all of the target crimes (§ 550, subd. (a)(5), (7), (8); Ins. Code, § 1871.4, subd. (a)(2)) "amount to insurance fraud" and all are "simply different methodologies that get you to insurance fraud." The prosecutor argued that, while the instruction as proposed by Pierce was appropriate "when you have different crimes. These are the same crime. They're all insurance fraud, just different theories of getting there."

Following a break for lunch, the trial court returned to the issue and noted that, if it adopted the People's position and the Court of Appeal disagreed with it, "then we're all looking at coming back and doing this over again." The prosecution stated it understood, but the proposed language presented "tremendous potential for unfairly gutting the People's case based on instructing in a … form that is too narrow."

Defense counsel then returned to his earlier argument that the original billing and rebilling were two separate conspiracies and that the trial court had a sua sponte duty to

give a unanimity instruction if the evidence suggested two discreet crimes, "i.e. two discreet conspiracies."

The trial court eventually adopted the prosecution's reasoning, finding the particular circumstances of *People v. Vargas* (2001) 91 Cal.App.4th 506 (*Vargas*) controlling. The trial court summarized the parties' arguments as follows:

> "[T]he defense believes that the indictment sets forth a conspiracy with four specific objects and specifically independent of each other. The People view this as a conspiracy to commit insurance fraud by several different mechanisms, all four of which happen to be violations of statutes."

In explaining its ruling, the trial court stated:

> "I'm gonna choose to follow the *Vargas* case, [and] find that this is an accusation of conspiring to commit insurance fraud and that the four specific code sections and related conduct that are set forth in the indictment are just different ways of committing the same object in the single—and the prosecution for the single agreement that's being alleged, and as a result, I'm gonna agree with the People, and over the clear objection of the defense, that I will not add the language to 415 that we discussed before lunch."

In light of this ruling, defense counsel then argued that a unanimity instruction should be given on the two separate conspiracies (the original billing and the rebilling of insurance claims), along with overt acts specific to each conspiracy. Defense counsel also argued that, by casting this as one rather than two conspiracies to commit insurance fraud, "you're taking away the statute-of-limitations defense by allowing [the prosecution] to cast it all as one big conspiracy." The trial court disagreed, stating that the jury, in evaluating the statute of limitations defense, would make a determination as to whether or not the rebillling was a separate conspiracy.

After discussion, the trial court noted that defense counsel could very well argue that, when the operations of P&R shut down, Pierce withdrew from the conspiracy, and the jury might conclude that the rebilling was or was not a separate conspiracy. As such, the trial court agreed to give CALCRIM No. 420, over the prosecution's objection, which

37.

instructs that a defendant is not guilty of conspiracy to commit insurance fraud if he withdraws from the alleged conspiracy.[13]

Defense counsel voiced a final objection to the lack of a unanimity instruction as to the conspiracy count, arguing that some of the target crimes were straight felonies and other wobblers. Noting that was not an issue that concerned the jury, the trial court again denied defense counsel's request.

*Pierce's Contention*

Pierce now contends he was deprived of his Sixth and Fourteenth Amendment rights to a jury trial and due process by the trial court's refusal to instruct the jury to unanimously agree which of the four discrete target crimes (§ 550, subd. (a)(5), (7), (8); Ins. Code, § 1871.4, subd. (a)(2)) was the basis for the conspiracy conviction. As argued by Pierce, "the objects of the conspiracy are not the same crime because they do not apply to the same criminal acts, have different elements, can take place years apart (such as the rebilling in this case) and are not punishable the same."

*Applicable Law and Analysis*

In a criminal case, a jury verdict must be unanimous. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) The jury also "must agree unanimously the defendant is guilty of a *specific* crime." (*Ibid.*) "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the

---

**13** We note that, subsequently, in closing, defense counsel never argued a statute of limitations defense. At oral argument, counsel called this a tactical decision. In addition, CALCRIM No. 3410 as given, stated that a defendant may not be convicted of conspiracy as alleged in count 1 unless the prosecution proved that the defendant or another member of the conspiracy committed an overt act in furtherance of the conspiracy sometime after June 4, 2009, while still a member of the conspiracy, and that the defendant could not be convicted of conspiracy unless the prosecution began within three years of the date of the crimes or any portion thereof were committed. In this case, prosecution began with the indictment on June 4, 2012.

particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) Even absent a request, the trial court should give a unanimity instruction "'where the circumstances of the case so dictate.' [Citation.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1199; see *People v. Hernandez* (2013) 217 Cal.App.4th 559, 569.)

As the California Supreme Court explained in *Russo*, "[t]his requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Russo, supra,* 25 Cal.4th at p. 1132.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the "'theory' whereby the defendant is guilty." (*Ibid.*) Hence, "the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at p. 1135.)

And, as stated in *Vargas,* relied on by the trial court below, "[T]he specific crimes that constitute the object of the conspiracy are not elements of the conspiracy. Rather, they are the means by which the purpose of the conspiracy was to be achieved." (*Vargas, supra,* 91 Cal.App.4th at p. 560.) Pierce was charged with one count of conspiracy to commit insurance fraud. Each of the specific crimes that constituted the object of the

conspiracy (§ 550, subd. (a)(5), (7), (8); Ins. Code, § 1871.4, subd. (a)(2)) described the means, namely insurance fraud, by which the purpose of the conspiracy was to be achieved. The prosecution argued as such below when discussing defense counsel's addition to CALJIC No. 415, stating that the additional wording in the instruction was not necessary because all of the target crimes "amount to insurance fraud" and all were "simply different methodologies that get you to insurance fraud." Despite Pierce's argument on appeal, defense counsel, during closing when addressing the conspiracy instruction, also referred to the specific crimes in count 1 as "all insurance fraud crimes." We agree that there was no requirement here to instruct on unanimity.

As part of his argument, Pierce also contends the trial court should have instructed the jury to determine whether one or two conspiracies had been proved, and to agree which conspiracy or conspiracies Pierce participated in. We disagree. The decision to charge Pierce with only one conspiracy was a prosecutorial charging discretion that we do not review. The exercise of that discretion includes questions of prosecutorial policies and judgment, not questions of fact for the jury to determine. (*Vargas, supra,* 91 Cal.App.4th at p. 553.)

## VI.    ARE THERE OTHER ERRORS THAT CUMULATIVELY PREJUDICED PIERCE?

Pierce next contends the trial court made other errors which prejudiced the defense. We address each contention in turn but find no error and/or resultant prejudice.

### *Denial of Discovery*

Pierce first argues that the trial court erred in quashing his subpoenas to the insurance carriers.

*Procedural Background*

Prior to trial, codefendant Lewis served subpoenas duces tecum on five named insurance carriers[14] for a variety of documents, namely correspondence or communication by the named insurance carriers with various entities concerning alleged fraudulent billing by P&R; medical consultant opinions comprising the basis for approval or denial of payment for medication dispensed and office consultations; and appraiser and/or adjuster manuals for evaluating and/or denying claims for outpatient evaluation and management and treatment. Lewis filed and served a motion for in camera review and for release of the documents. Pierce joined in the motion, but the trial court denied the motion as to Pierce and one other codefendant for lack of standing.

The trial court made an initial threshold finding that a showing had been made that the items sought had some relevance and that good cause for production had been shown, subject to objections raised by the insurance carriers. Motions to quash were filed by the insurance carriers.

Following argument, the trial court ordered the insurance carriers to comply with that portion of the requests which sought "production of all correspondence or communication by the designated person with Kern County Deputy D.A.'s or Kern County D.A. or California Dept. of Insurance Investigators … concerning alleged fraudulent billing by the designated corporate entities … during the calendar years 2004–2012, inclusive." In all other respects, the trial court sustained the objections and granted the motions to quash, finding the probative value and relevance of the documents sought to be minimal, burdensome and oppressive.

---

**14** Liberty Mutual Insurance Company, Berkshire Hathaway Homestate Companies, Traveler's Property Casualty, Zenith Insurance Company, and State Compensation Insurance Fund.

*Applicable Law and Analysis*

Pierce now contends denying production of "the insurer victim adjustor manuals and medical opinions given to support their denial of P&R bills" was error since it was necessary to show that "the carrier standards and policies were for reviewing and approving bills, and whether people opining on lack of medical necessity on their behalf were qualified to render those opinions."

We first question Pierce's standing to address this issue on appeal. The trial court denied Pierce's motion to join the discovery request for "lack of standing," although no rationale for this denial appears in the written ruling. In any event, we address Pierce's denial of the discovery claim and find no error.

Generally, this court "review[s] a trial court's ruling on discovery matters under an abuse of discretion standard." (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 48; see *People v. Prince* (2007) 40 Cal.4th 1179, 1232.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

Under Insurance Code section 1871.4, materiality of a false statement is an element of the offense. (See *People v. Gillard* (1997) 57 Cal.App.4th 136, 151.) A specific insurance carrier's internal standards and policies for reviewing and approving health care benefit claims may have some probative value in determining what statement, representation, or omission is material. However, intent, not materiality was at issue here. As stated by the trial court in its denial of the request for production of appraiser and/or adjuster manuals for evaluating or denying claims for paying health care benefits to medical providers:

> "Assuming … insurance carriers possess such manuals, they would disclose the policies of such carriers and could lead to evidence as to whether or not such carriers followed their policies in those instances where they rejected or paid claims made by Defendants. Whether or not such carriers followed their own policies is irrelevant. The issue is whether or not the billings

submitted were fraudulent under applicable legal standards. If, for the sake of argument, we were to assume that the documents sought might disclose one or more instances of a denial of payment in violation of the insurance carrier's internal policies, this would not evidence whether or not the billings were fraudulent."

As such, in quashing the defense subpoenas, the trial court reasonably concluded that the defense requests for such internal documents was of minimal relevance and value for the defense, and overburdensome on the insurance carriers. (Cf. *People v. Kaurish* (1990) 52 Cal.3d 648, 687 [concluding that trial court did not abuse its discretion in granting prosecution's motion to quash a defense subpoena to discover certain police reports, because defendant's request "was broad and somewhat burdensome" and defendant "failed to provide greater specificity or a greater showing of relevance in his broad discovery request"].)

Moreover, even if the court erred in denying the request, no prejudice resulted. Pierce, who contends only that the "extent of [the error] cannot be currently ascertained," does not show a reasonable probability that the trial's outcome would have been different had the discovery request been granted.

### Expert Opinion on the Law

Pierce next contends the trial court erred when it admitted Attorney James Fisher's testimony regarding standards and practices relating to workers' compensation claims. We find no prejudicial error.

#### Procedural Background

Prior to trial, the trial court held a hearing to determine the admissibility of the prosecution's proffered witness James Fisher, an attorney for the Department of Industrial Relations, Division of Workers' Compensation. The prosecution asked that Fisher be allowed to testify as an expert on the applicability and interplay of various guidelines and rules in the workers' compensation system. The trial court stated it would accept Fisher as an expert in that area, "that is he can testify as to how those factors are

43.

utilized by the [workers' compensation] Department, and why they're utilized in that fashion …, which would include his opinion or advice with respect to interpretation." But the trial court would not allow Fisher to testify "as a … baseline opinion what the legal authorities require." And, in response to a defense objection, the trial court precluded any opinion from Fisher as to "what knowledge [ ] Pierce did or did not have."

At trial, Fisher testified about the Department of Industrial Relations' standard and practices relating to workers' compensation claims. In preparation for his testimony, Fisher acknowledged that he had reviewed a number of P&R billings and reports "to determine whether the reports were … substantial evidence under the rules that we apply and whether the level of service that[] … was in those reports was supported by the content of the report." Fisher opined that the reviewed reports lacked the substantial evidence necessary to support the billing charges. Defense counsel objected, stating the question called for Fisher's opinion. The trial court overruled the objections, stating to the jury that the witness "is not advising you on the law," and that the trial court would instruct on the law to be followed. The trial court characterized Fisher as "testifying with respect to the policies and practices of his employer."

Pierce contends the trial court erred by allowing Fisher to testify as an expert witness regarding whether the billings at issue contained substantial evidence to support the billing charges, as this testimony contained improper legal opinions.

An expert witness may provide testimony that speaks to the ultimate factual issue in the case, such as what caused an injury at issue, but cannot provide an opinion as to a legal conclusion, such as whether there was sufficient causation between an alleged breach of duty and resulting injuries. (See *Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.) A witness testifies to a legal conclusion when he or she addresses the manner in which the law should apply to a particular set of facts and, therefore, an expert, particularly when the expert is a lawyer, may not offer testimony in which he or she reaches a conclusion by applying the law to the facts of the case. (*Id.* at

44.

p. 1179.) To allow such testimony would improperly usurp the duty of the court or jury. (*Ibid.*) The determination whether an expert witness's opinion bears upon or decides an ultimate issue in the case is sometimes a difficult decision, and "'a large element of judicial discretion [is] involved.'" (*People v. Wilson* (1944) 25 Cal.2d 341, 349.)

The jury was instructed that, in order to find Pierce guilty of insurance fraud pursuant to section 550, subdivision (a)(5), it had to find he prepared or conspired with another person to prepare a document with the intent to use it to support a false or fraudulent claim, that he knew the claim was fraudulent, and that he intended to defraud. To find Pierce guilty of insurance fraud pursuant to section 550, subdivision (a)(7), the jury had to find that he or that he with another person conspired to present a claim for a health-care benefit that was not used by or on behalf of the person named in the claim, knew the claim was false, and when he did the act he intended to defraud. To find Pierce guilty of insurance fraud pursuant to section 550, subdivision (a)(8), it had to find that Pierce presented or conspired to present multiple claims with the intent to defraud. And to find Pierce guilty of insurance fraud pursuant to Insurance Code section 1871.4, subdivision (a)(2), the jury had to find that Pierce knowingly presented or caused to be presented false or fraudulent material in support of a claim for workers' compensation benefits, the statement was material to the decision to pay for health care benefits, he knew that the statement was false or fraudulent, and he specifically intended to obtain such benefits to which he was not entitled.

Here, the court correctly ruled that Fisher could testify as to the department standards and practices of the workers' compensation system and whether the billings and reports in question met such standard and practices. Fisher did so by having reviewed the billings and reports and providing factual testimony detailing why the specific billings and reports did not meet the department's standards and practices. Such testimony was relevant to the question of "materiality," an element of the insurance fraud offense. However, Fisher did not give any opinion as to whether Pierce had knowledge

of the deficient P&R billings and reports, nor whether the deficiencies in the P&R billings and reports were due to an intent to defraud. Thus, Fisher did not offer a legal conclusion as to how the law applied to the facts in this particular case, and we reject Pierce's claim to the contrary.

*Hearsay Corroboration*

Pierce also contends the trial court prejudicially erred in admitting, as a prior consistent statement, Attorney Torres's testimony corroborating Yang's testimony that Pierce told Yang to lie in the continued deposition.

*Background*

At trial, Yang testified that, sometime after the first deposition session and before the second, Pierce told him to say that he had been checking the charts before signing them, which was a lie. On cross-examination, defense counsel sought to discredit Yang's testimony, showing Yang his personal notes, dated August 14, 2008. In those notes, Yang noted that Pierce had told him to "tell the truth."[15] At one point, Yang testified that some of his notes were made before he agreed to cooperate in his plea agreement. At another point, Yang agreed with defense counsel's suggestion that Yang's claim that Pierce had told him to say something false was made "for the first time after [he] decided to plead guilty and cooperate as a witness."[16]

In an effort to rehabilitate Yang, the prosecutor called Yang's attorney, David Torres, to testify concerning a communication he had with Yang, which the prosecution proffered as a prior consistent statement. The statement in question was whether Yang made specific reference to Pierce asking him to lie, and whether that statement was made to Torres after he had made a deal with the government. In an attempt to determine

---

[15] These notes, exhibits C13 and C14 are not in the record on appeal. It appears that both were ruled inadmissible.

[16] It is apparent from the entirety of Yang's deposition and testimony that he is not entirely comfortable speaking in English.

whether the communication between Torres and Yang showed a prior consistent statement, the trial court questioned the timeline and elicited the following: that the alleged statement of Pierce to lie was made sometime between the first and second deposition session, between August of 2007 and January of 2008, but that Yang had written a note on August 14, 2008, in which he "indicated and … admitted that he was encouraged in a slightly different context by [Pierce] to tell the truth." When asked, Torres testified that Yang spoke to him about Pierce's statement to lie in February of 2013.

Following further argument, the trial court allowed the statements as a prior consistent statement

> "in light of the fact that the defense was allowed to introduce the allegedly prior inconsistent statement of August 14th, 2008, and also because of the defense's questions and suggestions that the failure to memorialize any such prior consistent statement was evidence that there was no such statement."

At trial, Torres then testified that, while formulating a defense and reviewing with Yang the facts of the case, Yang told him that, prior to the second deposition session in January 2008, Pierce approached him and asked that he testify falsely. Yang told Torres that he had followed Pierce's instructions and lied at the deposition and informed Pierce that he had done so. Torres testified that his conversation with Yang occurred in February of 2013, at which time there was no prosecution offer of a plea for Yang, nor had Torres approached the government offering a plea from Yang.

*Applicable Law and Analysis*

Evidence Code section 1236 permits the admission of a prior statement, as hearsay evidence, if it is consistent with the witness's testimony at "the hearing" and is offered in compliance with Evidence Code section 791. Evidence Code section 791 provides:

> "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:

47.

"(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the [consistent] statement was made before the alleged inconsistent statement; or

"(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Absent an express or implied charge that a witness's trial testimony is recently fabricated or influenced by bias or improper motive, evidence of a prior consistent statement is not admissible. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219, fn. 6; *People v. Frye* (1985) 166 Cal.App.3d 941, 950.) "[A] prior consistent statement is admissible if it was made before the existence of *any one or more* of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony." (*People v. Hayes* (1990) 52 Cal.3d 577, 609, original italics.)

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) A trial court has abused its discretion when its ruling "'fall[s] "outside the bounds of reason."'" (*Id.* at p. 714.) We find that the trial court did not abuse its discretion in admitting the testimony of Torres regarding Yang's prior consistent statement.

Yang's prior February 2013 consistent statement to Torres—that Pierce told him to lie—satisfied subdivision (b) of Evidence Code section 791. Defense counsel accused Yang of fabricating what Pierce told him after Yang decided to plead guilty and cooperate as a witness, but Torres testified that Yang told him of what Pierce said before either party approached the other about a plea offer.

We find no error on the part of the trial court in allowing Torres to corroborate Yang's testimony.

48.

*Cumulative Error*

We finally reject Pierce's contention that the cumulative effect of the above errors deprived him of a fair trial. We have either rejected Pierce's claims of error and/or found any errors, assumed or not, were not prejudicial. Viewed cumulatively, we find any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

VII.   DID THE TRIAL COURT ERR IN DENYING PIERCE'S RECUSAL MOTION?

Pierce next contends that the trial court erred in denying his motion to recuse the trial prosecutor and the entire Workers' Compensation Fraud Unit of the Kern County District Attorney's Office under section 1424.

*Background*

In September of 2013, codefendant Lewis moved to recuse the trial prosecutor under section 1424, on the ground of prosecutorial misconduct. Pierce joined this recusal motion, and the trial court denied the motion.

In January of 2015, Pierce again moved to recuse the trial prosecutor, and this time, all deputy district attorney members of the Kern County Workers' Compensation Fraud Unit, and/or the entire Kern County District Attorney's Office under section 1424. As argued by Pierce:

> "The Kern County District Attorney's Workers Compensation Fraud Unit is funded by the California Insurance Commissioner upon the advice and consent of the Fraud Division and Fraud Assessment Commission as to the most effective distribution of grant funds to the various California District Attorneys (10 C.C.R. §2698.52(f)). The grant funds available are based upon assessments statutorily imposed upon insurance companies as determined each year by the fraud assessment commission (Insurance Code Section 1872.83(b)(1)). In addition, amounts collected as fines for violations of Workers Compensation statutes are added to the assessments (Insurance Code Section 1872.83(b)(4)(c))."

According to Pierce, this statutory funding scheme for the fraud unit "empowers the insurance commissioner to exercise control over criminal prosecutions," locking the

district attorney into a particular course of action. As evidence of this, Pierce cited, inter alia, to the Kern County District Attorney's Office statement to the Insurance Commission that it would always seek Labor Code fines in addition to criminal restitution and fines, negating the flexibility envisioned by the California Legislature in enacting the Labor Code civil fines.

The district attorney filed an opposition, and Pierce filed a reply to the opposition.

Following a hearing on the issue, the trial court denied Pierce's recusal motion, explaining, in part:

> "In this instance, the Court finds no actual conflict and no apparent conflict. This Court further finds there has been no showing of an 'actual likelihood' of prejudice. It is of further significance that the entity providing the financial assistance is a public agency and not the actual victim (corporate or otherwise). [¶] Prosecutors certainly have the right to set policies and to publicize policies. In most instances, following policies goes a long way to dispel any suggestion of unequal application of the law. Prosecuting agencies have the right (and the power and the discretion) to make exceptions to policies and sometimes do. Adopting or publicizing policies does not deprive the DA's office of the discretion or authority to deviate from policies. In fact, the prior dispositions in this case, suggest that the DA has exercised discretion in examining the contextual involvement of individual defendants and relative strengths and weaknesses of evidence that differ between defendants, as well as other factors. The fact that the District Attorney's office has set and publicized certain policies (which appear to be consistent with Legislative intent), which it is not legally obligated to follow, does not constitute an actual or potential conflict of interest. [¶] There is nothing improper about a public agency seeking an efficient return on its investment or considering issues of efficiency in making law enforcement decisions. [¶] … [¶] Here, at most, Defendants have shown that under certain conditions, a prosecutor might have a theoretical motive to pursue a non-meritorious case. This is not sufficient to meet the Defendants' burden of proving an actual or apparent conflict of interest, sufficiently grave to demonstrate an actual likelihood of prejudice towards moving Defendants."

*Applicable Law and Analysis*

Section 1424 establishes the standard governing motions to recuse a prosecutor. The motion "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) Under the statute, a defendant has the burden of showing by evidence that (1) a conflict of interest actually exists and (2) the level of conflict is so high that it is "unlikely that the defendant would receive a fair trial." (§ 1424, subd. (a)(1).) *People v. Eubanks* (1996) 14 Cal.4th 580, 592 (*Eubanks*) clarifies and expands this statutory standard to all portions of the proceedings, but it reiterates that even in the presence of actual conflict, the conflict must be of sufficient gravity to demonstrate an "actual likelihood of prejudice."

We review the trial court's decision to deny a recusal motion for an abuse of discretion. (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 728–729.) "Accordingly, we must determine whether the trial court's findings were supported by substantial evidence and whether, in turn, those findings support the decision to deny recusal. [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 361–362.) The defendant bears the burden of demonstrating a genuine conflict. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 709.)

At issue is whether the statutory funding scheme for the investigation and prosecution of workers' compensation insurance fraud (Ins. Code, § 1872.83) created a conflict of interest for the district attorney. As argued by Pierce, a conflict exists because the Kern County Workers' Compensation Fraud Unit receives grant funding from the California Insurance Commission. The funds, based on assessments statutorily imposed upon insurance companies, are used to criminally prosecute workers' compensation fraud cases, and includes the salaries and benefits of the two prosecutors in the unit (the prosecutor in this case being one of the two), as well as the salaries of the unit's investigator and paralegal, the computers and software. The grant funds are determined

51.

by the Fraud Assessment Commission, as outlined in Insurance Code section 1872.83, which provides in relevant part:

> "(b) To fund increased investigation and prosecution of workers' compensation fraud, … there shall be an annual assessment as follows: … [¶] … [¶]
>
> "(d) After incidental expenses, at least 40 percent of the funds to be used for the purposes of this section shall be provided to the Fraud Division of the Department of Insurance for enhanced investigative efforts, and at least 40 percent of the funds shall be distributed to district attorneys, pursuant to a determination by the commissioner with the advice and consent of the division and the Fraud Assessment Commission, as to the most effective distribution of moneys for purposes of the investigation and prosecution of workers' compensation fraud cases and cases relating to the willful failure to secure the payment of workers' compensation. Each district attorney seeking a portion of the funds shall submit to the commissioner an application setting forth in detail the proposed use of any funds provided. A district attorney receiving funds pursuant to this subdivision shall submit an annual report to the commissioner with respect to the success of his or her efforts.…"

The statute goes on to state that, if a district attorney is unable or unwilling to investigate and prosecute workers' compensation fraud claims, the commissioner "shall discontinue distribution of funds allocation for that county and may redistribute those funds according to this subdivision." (Ins. Code, § 1872.83, subd. (e).)

As evidence of the alleged conflict, Pierce cites to an August 13, 2010, letter to the Department of Insurance addressing the anticipated 2011–2012 budget, in which the prosecutor in this case stated that the county "remain[ed] committed to utilizing our program funds to achieve high levels of productivity and maximum results; convictions; commitment rates and restitution for our victims." An August 2012 letter from the Kern County Supervising District Attorney reiterated that sentiment.

Pierce alleges that, by accepting grant funding, the Kern County District Attorney agreed to criminally prosecute future cases, rather than civilly under Labor Code section 3820. Pierce argues, "The starting point of every discretionary prosecution decision that

52.

involved the amount of money claimed stolen was skewed by the prosecutor's decision to maximize restitution to the insurance carrier victims, even if the loss claimed was more than was due."

We first determine whether a conflict of interest exists between the district attorney's office and the defendant. A conflict exists if the evidence shows that the prosecutor is biased against the defendant, or if such animosity affects others within the prosecutorial office. (*Eubanks, supra,* 14 Cal.4th at p. 596.) The analysis focuses not on the mere appearance of a conflict of interest, but on a reasonable probability that the prosecution will treat the defendant unfairly. (*People v. Neely* (1999) 70 Cal.App.4th 767, 776.)

Moreover, recusal of an entire prosecutorial office is a drastic step that imposes a substantial burden on the People. (*Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277, 1286.) "'[W]hen the entire prosecutorial office of the district attorney is recused and the Attorney General is required to undertake the prosecution or employ a special prosecutor, the district attorney is prevented from carrying out the statutory duties of his elective office and, perhaps even more significantly, the residents of the county are deprived of the services of their [locally] elected representative in the prosecution of crime in the county.' [Citation.]" (*Eubanks, supra,* 14 Cal.4th at p. 594, fn. 6.) It is therefore reasonable to require that the defendant establish a showing that such a step is necessary to avoid an unfair trial. (*Lewis v. Superior Court, supra,* at p. 1286.)

In *Eubanks,* on which Pierce relies, the question was whether a crime victim's payment of substantial investigative expenses already incurred by the public prosecutor created a disabling conflict of interest for the prosecutor, requiring his disqualification. The defendants in *Eubanks* were accused of conspiracy to steal trade secrets. (*Eubanks, supra,* 14 Cal.4th at pp. 584–585.) Because the police department and prosecutor's office lacked staff with expertise to search the company's computers, a computer specialist was located and the company agreed to pay for the services. The district attorney indicated he

53.

allowed the company to pay for the assistance because the computer specialist's role was purely technical, involving no opinion as to whether trade secrets had been stolen, and because the prosecutor's office was "'experiencing serious budgetary constraints.'" (*Id.* at p. 586.) The superior court concluded the payment by the company put the district attorney in a position of feeling "'a greater obligation for this particular victim,'" and the district attorney might not "'exercise its discretionary function in an even-handed manner.'" (*Id.* at p. 587.)

The Court of Appeal reversed the recusal order, overturning the trial court's finding of conflict and holding that any conflict (if any) was insufficiently grave to justify recusal. (*Eubanks, supra,* 14 Cal.4th at pp. 584, 587–588.) The Supreme Court gave great deference to the trial court's discretion in finding the existence of a conflict of interest and reversed the Court of Appeal. The Supreme Court also clarified that (despite the language of section 1424), the correct standard for recusal under that statute encompasses both actual and apparent conflicts and that the likelihood that a defendant would not receive a fair trial (or actual likelihood of prejudice in all portions of the proceedings) must be real and not apparent. (*Eubanks, supra,* at pp. 592–593.)

Here, however, the entity providing the financial assistance is a public agency and not the actual victim (corporate or otherwise). As noted by the trial court here, Pierce confuses the role of a victim, as discussed in *Eubanks*, with the role of government agencies which represent the People and have obligations to follow statutory arrangements enacted by the Legislature. As stated by the trial court:

> "Taken to its logical conclusion, [Pierce's] argument would preclude the prosecution of any crime in which the victim was a resident of Kern County, since the District Attorney's Office is funded in part by county funds, and the source of such funds are taxes paid by Kern County residents."

54.

We agree with the trial court's finding that no actual conflict or apparent conflict existed, and that there was no showing of an actual likelihood of prejudice requiring recusal. We reject Pierce's claim to the contrary.

## VIII. DID SENTENCING OR RESTITUTION ERROR OCCUR?

The trial court determined that Pierce was subject to a prison sentence of two, three, or five years. Imposition of sentence was stayed and Pierce was placed on five years' probation upon the condition he serve one year in the county jail and pay $770,421 restitution, in addition to other standard terms of probation, fines and fees. The trial court specifically stayed the entire sentence, including restitution, pending this appeal. Pierce contends the trial court erred in sentencing him under section 182, subdivision (a)(1) and not under subdivision (a)(4), and it abused its discretion in ordering him to pay restitution under section 1202.4 in the amount of $770,421. We disagree.

*Sentencing*

Pierce argues that, because subdivision (a)(4)[17] of section 182 was encompassed within the given instructions on conspiring to commit a crime under subdivision (a)(1) of section 182, and the sentencing range for subdivision (a)(1) is greater than that for subdivision (a)(4), he should have been sentenced pursuant to the latter. We disagree.

Sentencing Pierce under subdivision (a)(1) of section 182, a felony, is proper. The district attorney, exercising prosecutorial discretion, properly charged Pierce with conspiracy to commit insurance fraud under section 182, subdivision (a)(1), instead of subdivision (a)(4). (See *People v. Valli* (2010) 187 Cal.App.4th 786, 801 [decision as to appropriate charges is a matter of prosecutorial discretion, founded upon constitutional principles of separate of powers and due process of law].) Neither the amended

---

[17] Section 182, subdivision (a)(4) is violated as follows: "(a) If two or more persons conspire: [¶] … [¶] (4) To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform those promises."

indictment, jury instructions or verdict forms directly or indirectly mentioned section 182, subdivision (a)(4). The jury specifically found Pierce guilty of subdivision (a)(1) of section 182.

Section 182, subdivision (a)(1) provides, if two or more persons conspire to commit a crime, with exceptions not applicable here,

> "they shall be punishable in the same manner and to the same extent as is provided for the punishment of that felony ...." (§ 182, subd. (a)(1).)

Here, the sentencing range for the alleged target offenses of section 550, subdivision (a)(5) and Insurance Code section 1871.4, is imprisonment in the county jail or imprisonment for two, three or five years. (§ 550, subd. (c)(1); Ins. Code, § 1871.4, subd. (b).) For section 550, subdivision (a)(7) and (8) the sentencing range is the same if the claim or amount at issue exceeds $950; if less than the $950 amount, the statute allows for imprisonment in the county jail not to exceed six months.

As argued by Pierce, the agreement to conspire was not found by the jury to exceed $950. However, section 182 also provides, in part:

> "If the felony is conspiracy to commit two or more felonies which have different punishments and the commission of those felonies constitute but one offense of conspiracy, the penalty shall be that prescribed for the felony which has the greater maximum term." (§ 182.)

Thus, the greater sentencing range of two, three or five years outlined in section 550, subdivision (a)(5) and Insurance Code section 1871.4, was proper here, since it proved to be the greater maximum term.

The trial court did not err in sentencing Pierce pursuant to section 182, subdivision (a)(1) and we reject his claim to the contrary.

*Restitution*

Nor do we find merit in Pierce's claim that the trial court abused its discretion in ordering restitution as it did.

The trial court ordered Pierce to be jointly and severally liable with three codefendants (Cabangangan, Yang, and Rios) for the restitution amount of $770,421.[18]

The trial court stated that the purpose of the restitution was to provide restitution to Berkshire Hathaway, Zenith, Travelers Insurance, State Farm and State Fund Insurance companies for their losses. In ordering restitution, the trial court set forth its reasoning as follows:

> "I had … before me multiple bills and a summary from one carrier, which, presumably, verified the testimony of the witnesses that I reviewed … that the total amounts paid by Travelers, Berkshire [Hathaway], Zenith, State Comp and State Farm were $2,919,924.87. No one presented that total, but that was the total I got totaling the amounts testified to by the witnesses for those carriers.…

> "I have reread and reconsidered the *Monterey Mushroom* case, but while that case does talk with respect to various issues about the concept of a generally fraudulent scheme, I do not read that case as supporting the proposition that when there is evidence of a generally fraudulent scheme, PC 1202.4 restitution can be calculated based on the assumption that each and every bill was fraudulent and that each and every check received represented proceeds of fraud.

> "The only attempt to analyze these bills and payments for purpose of this hearing was Kirsten Bretz. She calculated—again, no one totaled it, but—I don't think anyone totaled it, but I calculated it as $261,368.77 paid on certain specified contested codes, which I utilized as a starting point.

> "Dr. Yang testified extensively and in great detail during his trial testimony, I would say far more than any of the other doctors, as to what the procedures and practices … which were followed while he was employed. And based on that, I agree with the People, that it sounds like all of those transactions were fraudulent. And the People had calculated that P & R received $770,421 during the specified portion of the time period that Dr. Yang was employed, and this is a number which is verifiable. I have no doubt that the amount of the fraudulent billings greatly exceeded this amount.

---

[18] Cabangangan was ordered to pay $3.4 million in restitution; Yang $770,421 in restitution; and Rios $1 million in restitution, but he was given the opportunity to "buy out" for $250,000, which he did.

"I heard trial testimony concerning certain specific transactions which were clearly fraudulent, but I can't determine how many of these transactions were and were not included in the $770,000 total, and I can't determine how much of the $261,000 figure calculated by Miss Bretz is included.

"So I do feel that the People have established a prima facie case that the losses were at least $770,421.

"The defense is contending that those losses should be reduced by amounts they allege should have been paid by these same carriers for medications provided.

"I had the same problem with the defense argument and calculations as I did with the People.

"I find that the evidence is insufficient to support an assumption that each medicine was dispensed … for a proper purpose, that each medicine was properly documented, and that the conditions precedent for paying for such medicines had occurred; therefore, I'm allowing no reduction for these amounts.

" … [D]espite the People's concession on the issue, I have some concerns about crediting Dr. Pierce with payments made by codefendants for their agreed-upon restitution, since I cannot tell whether the codefendants' payments were intended to pay these specific damages or other damages, with the exception of Dr. Yang, because clearly his agreement was to pay for these same damages.  And I seem to recall that at least one of the defendants, as part of his sentence, was ordered to pay restitution without credit for contributions made by codefendants.

"But I think the best the court can do, without engaging in outright speculation, is to fix restitution at $770,421 and to provide that Dr. Pierce is entitled to credit for any restitution payments made by Miss Cabangangan, Dr. Yang or Dr. Rios.  So that is my ruling.

"The total amount for restitution is $770,421, which is the same amount Dr. Yang was ordered to pay .…"

Section 1202.4, subdivision (a)(3)(B), requires the court to order a defendant to pay restitution to victims in accordance with subdivision (f).  Section 1202.4, subdivision (f), states, in pertinent part, "[I]n every case in which a victim has suffered economic loss *as a result of the defendant's conduct*, the court shall require that the defendant make

restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Italics added.) The insurance companies clearly qualify for restitution in the instant case, as each is a "victim" as defined by statute. (See § 1202.4, subd. (k)(2) [noting a "victim" for purposes of this statute includes a "corporation"]; *People v. Sy* (2014) 223 Cal.App.4th 44, 62.)

"'[T]he trial court is vested with broad discretion in setting the amount of restitution [and] it may "'use any rational method of fixing the amount of restitution which is reasonably calculated to make the victim whole.'"'" (*People v. Ortiz* (1997) 53 Cal.App.4th 791, 800.) All that is required is that the court's award have a "rational basis" (*id.* at p. 799), and the standard of proof at a restitution hearing is preponderance of the evidence. (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.) "[A] prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has ... made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim. [Citations.]' [Citation.]" (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.) "There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1121.)

"'The standard of review of a restitution order is abuse of discretion. "A victim's restitution right is to be broadly and liberally construed." [Citation.] "'When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court.'" [Citations.]' [Citation.]" (*People v. Baker, supra,* 126 Cal.App.4th at p. 467.) Moreover, although a restitution award may be challenged on the ground no substantial evidence supports the award, "[i]n reviewing the

sufficiency of the evidence, the "'power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,'" to support the trial court's findings.' [Citations.] ... 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding. [Citation.] We do not reweigh or reinterpret the evidence; rather, we determine whether there is sufficient evidence to support the inference drawn by the trier of fact." (*Id.* at pp. 468–469.) Because we must "give due deference to the trier of fact and not retry the case ourselves," an appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

Pierce argues that the trial court abused its discretion by using the same sum agreed to by Yang, because other physicians worked for P&R during the same time period, and because the trial court failed to take into account unpaid sums owed by the victims to P&R for medications dispensed.

Here, the issue is not whether the insurance companies were entitled to restitution for payments made on fraudulent claims, as they clearly were. Instead, the issue is whether the amount calculated by the trial court fairly apportioned costs to Pierce. We conclude ample evidence supports the trial court's calculations.

In this case, the trial court stated that the amount paid to P&R by the various insurance companies, by the trial court's calculation, totaled $2,919,924.87. Noting that in cases involving a generally fraudulent scheme, section 1202.4 restitution was not "based on the assumption that each and every bill was fraudulent and that each and every check received represented proceeds of fraud," the trial court ordered Pierce to pay restitution in a much lower amount, the same amount as that allocated for Yang. In doing so, the trial court explained that it found "verifiable" the People's calculation that P&R received $770,421 during the specified portion of the time period Yang, who testified extensively on procedures and practices of P&R, was employed; Pierce was necessarily a

60.

part of P&R during that time period as well.  The trial court also noted, however, that it had "no doubt that the amount of the fraudulent billings greatly exceeded this amount." The trial court found that the People established a prima facie case that the losses were "at least" $770,421, and that it was allowing no reduction for amounts Pierce claimed were for properly dispensed medications, stating there was insufficient evidence to support such an assumption.  (*People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1137–1138 [burden shifts to defendant to prove offsets or credit.)  The trial court added that Pierce was entitled to credit for any restitution payments made by Yang, Rios or Cabangangan.

Limiting restitution to a "verifiable" amount, as the trial court did here, is not unreasonable, and we reject Pierce's claim to the contrary.  (See, e.g., *United States v. Rodriguez* (11th Cir. 2014) 751 F.3d 1244, 1261.)

## DISPOSITION

The judgment is affirmed.

_____
FRANSON, Acting P.J.

WE CONCUR:


_____
SMITH, J.


_____
SNAUFFER, J.

61.

Filed 8/2/19

## <u>CERTIFIED FOR PUBLICATION</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE , <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DOLPHUS DWAYNE PIERCE II, <br><br> Defendant and Appellant. | F074602 <br><br> (Super. Ct. No. BF141700E) <br><br> **ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION** <br> **[No Change in Judgment]** |

It is ordered that the opinion filed herein on July 11, 2019, be modified as follows:

1. On page 40, add the letter "*A.*" before the subheading "*Denial of Discovery.*"
2. On page 43, add the letter "*B.*" before the subheading "*Expert Opinion on the Law*."
3. On page 46, add the letter "*C.*" before the subheading "*Hearsay Corroboration.*"
4. On page 49, add the letter "*D.*" before the subheading "*Cumulative Error.*"

There is no change in the judgment.

It appearing that part of the nonpublished opinion filed in the above-entitled matter on July 11, 2019, meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), IT IS SO ORDERED that the opinion be certified for publication

in the Official Reports with the exception of parts I., III., IV., V., VI.B., VI.C., VI.D., and VIII. of the Discussion.

                                        FRANSON, Acting P.J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.